**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE – NASHVILLE DIVISION**

**HEIDI HUMPHREYS**, individually and on behalf of all others similarly situated,

Plaintiff,

v.

**CHANGE HEALTHCARE INC.; OPTUM, INC.; UNITEDHEALTH GROUP INCORPORATED; and UNITEDHEALTHCARE, INC.,**

Defendants.

Civil Action No.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Heidi Humphreys ("Plaintiff"), by and through the undersigned counsel, brings this class action complaint against Defendants Change Healthcare Inc. ("Change Healthcare"), Optum, Inc. ("Optum"), UnitedHealth Group Incorporated ("UHG"), and UnitedHealthcare, Inc. ("UnitedHealth" and collectively, "Defendants"), on behalf of herself and all others similarly situated. Plaintiff makes the following allegations based upon personal knowledge as to her own actions and upon information and belief as to all other matters:

**INTRODUCTION**

1. Patients and providers throughout the United States are suffering the consequences of what might be the most consequential data breach in history – one that has resulted in network outages that have already impacted millions of patients and physicians across the country. The fallout from this Data Breach has and continues to wreak havoc on the healthcare industry.

2. On February 21, 2024, UHG disclosed in an SEC filing that Change Healthcare was the subject of a massive data breach whereby hackers known as "ALPHV/Blackcat" ("Blackcat") gained unauthorized access to its networks (the "Data Breach").

3. The American Hospital Association described the breach as "the most serious incident of its kind leveled against a U.S. health care organization."[1]

4. Blackcat is a notable cybergroup that infiltrates healthcare institutions' internal servers through vulnerabilities in the institutions' networks. The group uses "ransomware to identify and attack 'high-value victim institutions[.]'"[2]

5. According to the Department of Justice, Blackcat typically steals victims' data and encrypts the institution's data, networks, and servers, blocking the institution from accessing them. Once the institutions are immobilized, the group then demands that they pay a ransom in exchange for the keys to decrypt the institution's network and servers, and a promise that Blackcat will not publish the institution's data to the group's site on the Dark Web. Still, even when ransoms are paid, this data often ends up on the Dark Web. Blackcat has emerged as the second most prolific ransomware-as-a-service variant in the world.[3]

6. Blackcat accessed, copied, and exfiltrated highly sensitive information stored on Defendants' servers for millions of individuals, including active US military/navy personnel

---

[1] Rick Pollack, President and CEO, AHA, *Supporting Hospitals and Patients After Cyberattack on Change Healthcare*, American Hospital Association (Feb. 29, 2024), https://www.aha.org/news/perspective/2024-02-29-supporting-hospitals-and-patients-after-cyberattack-change-healthcare#.

[2] James Farrell, *Change Healthcare Blames 'Blackcat' Group for Cyber Attack That Disrupted Pharmacies and Health Systems*, FORBES (Feb. 29, 2024), https://www.forbes.com/sites/jamesfarrell/2024/02/29/change-healthcare-blames-blackcat-group-for-cyber-attack-that-disrupted-pharmacies-and-health-systems/?sh=20a8092c1c4d (last visited March 28, 2024).

[3] *Justice Department Disrupts Prolific ALPHV/Blackcat Ransomware Variant*, DOJ (Dec. 19, 2023), https://www.justice.gov/opa/pr/justice-department-disrupts-prolific-alphvblackcat- ransomware-variant.

identifiable information, medical records, dental records, payment information, claims information, patients' information (such as phone numbers, addresses, Social Security numbers, emails, etc.), insurance records, and more ("PHI").[4] Blackcat also encrypted portions of Defendants' network, rendering them unusable.

7. PHI is considered "the most confidential and valuable type of [PII] . . . irrevocable once breached."[5]

8. Change Healthcare, as part of Defendants' healthcare empire, provides revenue and payment cycle management that connects payers, providers, and patients within the U.S. healthcare system, and processes 15 billion transactions annually, "touching one in three U.S. patient records."[6] Once Defendants discovered the Data Breach, Defendants decided to take certain systems offline, bringing significant portions of the healthcare industry to a screeching halt.

---

[4] *MMRG Notifies Patients of Cybersecurity Incident*, BUSINESS WIRE (Feb. 6, 2024), https://www.businesswire.com/news/home/20240206060527/en/.

[5] Junyuan Ke, et al., *My Data or My Health? Heterogenous Patient Responses to Healthcare Data Breach*, SSRN (Feb. 10, 2022), http://dx.doi.org/10.2139/ssrn.4029103. Under the Health Insurance Portability and Accountability Act, 42 U.S.C. §§1320d, et seq. ("HIPAA"), PHI is considered to be individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. §160.103. Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. Summary of the HIPAA Privacy Rule, U.S. DEP'T OF HEALTH & HUMAN SERS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited March 28, 2024).

[6] Nicole Sganga & Andres Triay, *Cyberattack on UnitedHealth still impacting prescription access: "These are threats to life,"* CBS NEWS (Feb. 29, 2024), https://www.cbsnews.com/news/unitedhealth-cyberattack-change-healthcare-prescription-access- still-impacted/.

9. Without Defendants' functioning systems, the healthcare industry is immobilized. Patients are stuck in prescription purgatory without access to their vital medications. This is especially disruptive to elderly patients who have a fixed income and cannot afford medications without insurance, as well as individuals with chronic illnesses who face life-threatening symptoms without their medication. Defendants' network outage has and continues to jeopardize the health of millions of Americans.

10. Following the Data Breach and continuing to date, health systems throughout the United States—including hospitals, physician groups, dental clinics, and pharmacies—reported that they were unable to fulfill or process prescriptions through patients' insurance, making prescription medication inaccessible.[7]

11. The outage has already lasted for months, and UHG still has not fully restored all of the affected products and services.[8]

12. Millions of impacted patients will not be aware that the Data Breach has affected their medical data, other Private Information, or their ability obtain necessary prescription medications until they try to fill a prescription or visit their provider and cannot.

13. Plaintiff's and Class Members' identities are now at a heightened risk of exposure because of Defendants' negligent conduct since the Private Information that Defendants collected and stored is now in the hands of data thieves.

---

[7] The system outage prevented insurance verification and, thus, impacted patient ability to obtain medication. *See*, *A Cyberattack on UnitedHealth Unit Disrupts Prescription Drug Orders*, The New York Times (February 26, 2024), https://www.nytimes.com/2024/02/26/health/cyberattack-prescriptions-united-healthcare.html (last visited March 29, 2024).

[8] UnitedHealth Group Updates on Change Healthcare Cyberattack (as of April 22, 2024), https://www.unitedhealthgroup.com/newsroom/2024/2024-04-22-uhg-updates-on-change-healthcare-cyberattack.html (last visited May 1, 2024).

14. Armed with the Private Information accessed in the Data Breach, data thieves can now use the PII and PHI obtained from Defendants to commit a variety of crimes, including credit/debit card fraud, tax fraud, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' names to set up utility accounts, using Class Members' health information to target other phishing and hacking intrusions based upon their individual health needs, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

15. The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or be denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

16. As a direct result of the Data Breach, Plaintiff and Class Members have suffered fraud and will continue to be exposed to a heightened and imminent risk of fraud and identity theft, potentially for the rest of their lives. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft, and their medical accounts to guard against medical identity theft.

17. Plaintiff and Class Members may also incur out-of-pocket costs for purchasing credit monitoring services, identity theft protection services, credit freezes, credit reports, and other protective measures to deter and detect identity theft.

18. As a direct and proximate result of the Data Breach and subsequent exposure of their Private Information, Plaintiff and Class Members also suffered additional ascertainable losses, including, but not limited to, a loss of the value of their private and confidential information, and the loss of the benefit of their contractual bargain with Defendants.

19. As a direct and proximate result of the Data Breach and subsequent exposure of their Private Information, Plaintiff and Class Members have suffered, and will continue to suffer damages and economic losses in the form of lost time needed to take appropriate measures to avoid unauthorized and fraudulent charges, putting alerts on their credit files, and dealing with spam phone calls, letters, and emails received as a result of the Data Breach.

20. As a direct and proximate result of the Data Breach and subsequent exposure of their Private Information, Plaintiff and Class Members have suffered, and will continue to suffer, an invasion of their property interest in their own PII and PHI such that they are entitled to damages from Defendants for unauthorized access to, theft of, and misuse of their Private Information. These harms are ongoing, and Plaintiff and Class Members will suffer from future damages associated with the unauthorized use and misuse of their Private Information as thieves will continue to use the information to obtain money and credit in their names for several years.

21. As a direct and proximate result of the Data Breach and Defendants' subsequent systems shutdown, Plaintiff and Class Members suffered ascertainable losses when they were unable to obtain their prescriptions in a timely manner; unable to obtain their prescriptions at all; or could not process pricing for or payment of those prescriptions through insurance..

22. Plaintiff seek to remedy these harms on behalf of all similarly situated individuals whose Private Information was accessed via and/or compromised by UHG during the Data Breach.

23. Defendants are responsible for the Data Breach because they failed to implement reasonable security procedures and practices and failed to disclose material facts surrounding their deficient security protocols.

24. As a result of Defendants' failure to protect the sensitive information it was entrusted to safeguard, Plaintiff and Class members did not receive the benefit of their bargain with Defendants and now face a significant risk of medical-related theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.

## PARTIES

25. Plaintiff Heidi Humphreys is a citizen and resident of Pennsylvania who fills her medical prescriptions at a local pharmacy that uses Defendants' Change Healthcare platform.

26. Defendant Change Healthcare Inc is a Delaware corporation with its principal place of business in Nashville, Tennessee.

27. Defendant Optum, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.

28. Defendant UnitedHealth Group Incorporated is a Delaware corporation with its principal place of business in Minnetonka, Minnesota.

29. Defendant UnitedHealthcare, Inc. is a Delaware corporation with its principal place of business in Minnetonka, Minnesota.

## JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs. There are more than 100 putative class members and at least some members of the proposed Class, including Plaintiff, have a different citizenship from Defendants. This

Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because all claims alleged herein form part of the same case or controversy.

31. This Court has jurisdiction over Defendants because they maintain and operate their headquarters in this District and/or are authorized to and do conduct business in this District.

32. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) (1) & (2) because Defendants reside in this District and/or a substantial part of the events and omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### ***Defendants' Relationship***

33. UHG operates through four segments: UnitedHealthcare, and three Optum segments: (1) Optum Health, (2) Optum Insight, and (3) Optum Rx (collectively, "Optum").[9]

34. Optum Health "provides care directly through local medical groups and ambulatory care systems, including primary, specialty, urgent and surgical care to nearly 103 million consumers."[10] Optum Health's customers "include employers, health systems, government and health plans."[11]

35. Optum Insight "provides data, analytics, research, consulting, technology and managed services solutions to hospitals, physicians, health plans, governments and life sciences

[9] *UnitedHealth Group Incorporated (UNH)*, YAHOO! FINANCE, https://finance.yahoo.com/quote/UNH/profile (last visited Mar. 29, 2024).
[10] *Optum: Technology and data-enabled care delivery*, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/people-and-businesses/businesses/optum.html (last visited Mar. 29, 2024).
[11] *Id.*

companies. This business helps customers reduce administrative costs, meet compliance mandates, improve clinical performance and transform operations."[12]

36. Optum Rx "offers a full spectrum of pharmacy care services that are making drugs more affordable and creating a better experience for consumers, filling more than 1.5 billion adjusted retail, mail and specialty drug prescriptions annually."[13] In the regular course of its business, Optum Rx receives and maintains payment and health information from both patients and benefit sponsors.[14]

37. Change Healthcare is a healthcare technology company that provides data- driven and analytics-driven solutions for clinical, financial, administrative, and patient management to healthcare providers.[15] Change Healthcare holds itself out as providing "data and analytics, plus patient engagement and collaboration tools" to "providers and payers [to] optimize workflows, access the right information at the right time, and support the safest and most clinically appropriate care."[16]

38. Change Healthcare is one of the largest processors of prescription medications in the United States and handles billing for more than 67,000 pharmacies across the country through which it handles 15 billion healthcare transactions annually.[17] Change serves as a digital

[12] *Id*.
[13] *Id*.
[14] *Id*.
[15] *OptumInsight and Change Healthcare Combine to Advance a More Modern, Information and Technology-Enabled Health Care Platform*, OPTUM (Jan. 6, 2021), https://www.optum.com/en/about-us/news/page.hub.optuminsight-change-healthcare- combine.html.
[16] *The Change Healthcare Platform*, CHANGE HEALTHCARE, https://www.changehealthcare.com/platform (last visited Mar. 28, 2024).
[17] Zack Whittaker, *UnitedHealth confirms ransomware gang behind Change Healthcare hack amid ongoing pharmacy outages*, TECHCRUNCH (Feb. 29, 2024) https://techcrunch.com/2024/02/29/unitedhealth-change-healthcare-ransomware-alphv-blackcat-pharmacy-outages/.

intermediary to verify a patient's insurance coverage for prescriptions, process "coupons" and "co-pay" cards provided by manufacturers to help patients (including uninsured or under-insured) afford expensive medications and treatments. Change's "cloud-based network supports 14 billion clinical, financial, and operational transactions annually."[18]

39. Change Healthcare also states on its website[19]:

> The Change Healthcare Platform provides industry-leading analytics, expansive data, and unparalleled connection and data transfer between providers, payers, and consumers to help improve workflows, increase administrative and financial efficiencies, and improve clinical decisions.

40. Change Healthcare's services are critical to providing healthcare throughout the United States.

41. In October 2022, UHG completed its acquisition of Change Healthcare,[20] for it to merge with OptumInsight.[21] Optum described the purpose of the acquisition as follows:

> This combination unites two technology and service companies focused on serving health care. Their combined capabilities will more effectively connect and simplify core clinical, administrative and payment processes - resulting in better health outcomes and experiences for everyone, at lower cost. Change Healthcare brings key technologies, connections and advanced clinical decision, administrative and financial support capabilities, enabling better workflow and transactional connectivity across the health care system. Optum brings modern analytics,

---

[18] Darius Tahir, Bernard J. Wolfson, and Daniel Chang, *Health industry struggles to recover from cyberattack on a unit of UnitedHealth*, NPR, March 9, 2024, available at https://www.npr.org/sections/health-shots/2024/03/09/1237038928/health-industry-ransomware-cyberattack-change-healthcare-optum-uhc-united.

[19] https://www.changehealthcare.com/about (last visited May 1, 2024).

[20] *UnitedHealth Group Form 10-K (Dec. 31, 2022)*, SEC, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2022/UNH-Q4-2022-Form-10-K.pdf (last visited Mar. 28, 2024).

[21] *OptumInsight and Change Healthcare Combine to Advance a More Modern, Information and Technology-Enabled Health Care Platform*, OPTUM (Jan. 6, 2021), https://www.optum.com/en/about-us/news/page.hub.optuminsight-change-healthcare- combine.html.

> comprehensive clinical expertise, innovative technologies and extensive experience in improving operational and clinical performance.[22]

42. The President of UHG and CEO of Optum said that the combination of Change's and Optum's services "will help streamline and inform the vital clinical, administrative and payment processes on which health care providers and payers depend to serve patients."[23]

43. Thus, Optum and Change Healthcare receive and/or maintain patients' payment and health insurance information, as well as patients' sensitive health information, in the regular course of their business.

44. As stated in UHG's latest annual report filed with the SEC, UHG "acquired all of the outstanding common shares of Change Healthcare"[24] such that Change Healthcare—like Optum—is now fully owned by UHG and operated as one of UHG's business segments.[25]

45. UHG is responsible for overseeing Defendants' cybersecurity practices and procedures.

***Defendants' Data Collection and Privacy Practices***

46. In the regular course of business, Defendants store patients' highly sensitive health information collected from clients like Medicare, pharmacies, and healthcare providers, among others. This includes patients' full names, phone numbers, addresses, Social Security

---

[22] *Id.*
[23] *Id.*
[24] *UnitedHealth Group Form 10-K (Dec. 31, 2022)*, SEC, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2022/UNH-Q4-2022-Form-10-K.pdf (last visited Mar. 28, 2024)
[25] *OptumInsight and Change Healthcare Combine to Advance a More Modern, Information and Technology-Enabled Health Care Platform*, OPTUM (Jan. 6, 2021), https://www.optum.com/en/about-us/news/page.hub.optuminsight-change-healthcarecombine.html.

numbers, emails, medical records, dental records, payment information, claims information, insurance records, and much more.

47. With respect to personal information, Change Healthcare states on its website[26] that it uses "Leading-Edge Technology" to secure customer payment information and accounts. According to Change Healthcare, it "leverage[s] the latest technology, public and private data sources to fortify our processes and ensure your information is protected."

48. Through the possession and utilization of Plaintiff' and Class Members' Private Information, Defendants assumed duties owed to Plaintiff and Class Members regarding their Private Information. Therefore, Defendants knew or should have known that it was responsible for safeguarding Plaintiff' and Class Members' Private Information from unauthorized access and criminal misuse.

49. Defendants maintain privacy policies describing how confidential and personal information is used and disclosed. Change Healthcare represents that "[w]e implement and maintain organizational, technical, and administrative security measures designed to safeguard the data we process against unauthorized access, destruction, loss, alteration, or misuse. These measures are aimed at providing on-going integrity and confidentiality of data, including your personal information."[27] Defendants UnitedHealth Group Incorporated, UnitedHealthcare, and Optum operate under the same "Privacy Policy." They represent that they maintain "administrative, technical, and physical safeguards" designed to protect patients' information.[28]

---

[26] https://www.changehealthcare.com/fraud-prevention (last visited May 1, 2024).

[27] *Change Healthcare Global Privacy Notice*, CHANGE HEALTHCARE, https://www.changehealthcare.com/privacy-notice (last visited Mar. 28, 2024).

[28] *Protecting Your Information*, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/privacy.html#protectingyourinformation (last visited Mar. 28, 2024);

Their "Social Security Number Protection Policy" explicitly states that "[i]t is [their] policy to protect the confidentiality of Social Security numbers . . . that [they] receive or collect in the course of business It is [their] policy to limit access to SSNs to that which is lawful and to prohibit unlawful disclosure of SSNs."[29]

50. Given Defendants' representations and experience handling highly sensitive PHI and other Private Information, Defendants understood the need to protect patients' PHI and other Private Information and prioritize data security.

51. Plaintiff and Class Members relied on Defendants to keep their Private Information secure and safeguarded for authorized purposes. Defendants owed a duty to Plaintiff and Class Members to secure their Private Information as such, and ultimately breached that duty.

***The Data Breach***

52. In an SEC filing dated February 22, 2024, UHG announced that on February 21, 2024 they identified that "a suspected nation-state associated cyber security threat actor had gained access to some of the Change Healthcare information technology systems."[30] After detecting the breach, UHG claimed to have "proactively isolated the impacted systems from

*Protecting Your Information*, UNITEDHEALTHCARE, https://www.uhc.com/privacy#protectinginfo (last visited Mar. 28, 2024); *Protecting Your Information*, OPTUM, https://www.optum.com/en/privacy-policy.html#protect (last visited Mar. 28, 2024).

[29] *Social Security Number Protection Policy*, UNITEDHEALTH GROUP, https://www.unitedhealthgroup.com/privacy.html#socialsecurityprotection (last visited Mar. 28, 2024); *Social Security Number Protection Policy*, UNITEDHEALTCARE, https://www.uhc.com/privacy#ssprotection (last visited Mar. 28, 2024); *Social Security Number Protection Policy*, *OPTUM*, https://www.optum.com/en/privacy-policy.html#ssn (last visited Mar. 28, 2024).

[30] *UnitedHealth Group Incorporation Form 8-K*, SEC (Feb. 22, 2024), https://www.sec.gov/Archives/edgar/data/731766/000073176624000045/unh-20240221.htm.

other connecting systems…"[31] UHG also said it was "working with law enforcement" and allegedly "notified customers, clients and certain government agencies" of the breach.[32] UHG disclosed that the "network interruption [was] specific to Change Healthcare…"[33]

53. Defendants' initial claims about the nature and scope of the Data Breach were not the whole story.

54. Blackcat exposed the true extent of the Data Breach, including that it related to all Defendants, not just Change Healthcare. The group also revealed that it was "able to exfiltrate to be exact more than 6 TB of highly selective data" that "relates to all Change Health clients that have sensitive data being processed by the company." Blackcat identified several entities about whom it obtained sensitive data, including Medicare, Tricare, CVS-CareMark, Loomis, MetLife, and others.

55. Blackcat disclosed that the exfiltrated data includes millions of: "active US military/navy personnel PII," "medical records," "dental records," "payments information," "Claims information," "Patients PII including Phone numbers/addresses/SSN/emails/etc…," "3000+ source code files for Change Health solutions…," "Insurance records," and "many many more." Blackcat warned UHG that "you are walking on a very thin line be careful you just might fall over."

56. Given the intentional and criminal nature of the cybersecurity attack, Plaintiff's and Class Members' Private Information is now for sale to criminals on the dark web; meaning unauthorized parties have accessed and viewed Plaintiff's and Class Members' Private Information. Although Defendants have not yet confirmed the types of Personal Information

---

[31] *Id.*
[32] *Id.*
[33] *Id.*

compromised in the Data Breach, on information and belief, the exposed information includes names, medical and dental records, medical claims and insurance information (including diagnosis and prescription information), Social Security numbers, email addresses, and more.

***<u>The Healthcare Sector Is Particularly Susceptible to Cyberattacks</u>***

57. Defendants were or should have been on notice that the Federal Bureau of Investigation ("FBI") has been concerned about data security in the healthcare sector. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "'[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII).'"[34]

58. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[35]

---

[34] Jim Finkle, *FBI warns healthcare firms that they are targeted by hackers*, REUTERS (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820.

[35] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASS'N (Oct. 4, 2019), https://www.ama-assn.org/practice-management/ sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals (emphasis omitted).

59. The number of U.S. data breaches surpassed 1,000 in 2016, a record high and a forty percent increase in the number of data breaches from the previous year.[36] In 2022, 1,802 data compromises were reported that impacted over 422 million victims—marking a 42% increase in the number of victims impacted since 2021.[37] That upward trend continues.

60. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach.[38] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[39] Almost 50% of the victims lost their healthcare coverage as a result of the incident, while nearly thirty percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.[40]

61. In an article published on October 31, 2023, the HHS noted that "[r]ansomware and hacking are the primary cyber-threats in healthcare." According to HHS statistics, since

---

[36] Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout, CISION PR NEWSWIRE (Jan. 19, 2017), https://www.prnewswire.com/news-releases/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout-300393208.html.
[37] 2022 Annual Data Breach Report, IDENTITY THEFT RES. CTR., https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf (last visited March 29, 2024).
[38] 2018 End-of-Year Data Breach Report, IDENTITY THEFT RES. CTR., https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINALWEB-V2-2.pdf (last visited March 29, 2024).
[39] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.
[40] *Id.*

2019 there has been a 239% increase in large breaches reported to HHS' Office for Civil Rights and a 278% increase in ransomware attacks.[41]

62. Healthcare related data breaches also come at a cost to the breached entities. According to IBM's 2023 Cost of a Data Breach Report, the healthcare sector reported the highest data breach costs for the thirteenth year in a row in 2023—increasing 8.2% from $10.10 million in 2022 to $10.93 million in 2023.[42] This cost should only further incentivize service providers to both invest in and implement reasonable and adequate security measures in order to avoid financial repercussions in the event of a breach.

63. Healthcare related data breaches have continued to rapidly increase. According to the 2019 HIMSS Cybersecurity Survey, 82% of participating hospital information security leaders reported having a significant security incident in the last 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[43]

> Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information (PII) for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers.[44]

64. "[E]ven relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social

---

[41] HHS' Office for Civil Rights, *HHS' Office for Civil Rights Settles Ransomware Cyber-Attack Investigation* (October 31, 2023) https://www.hhs.gov/about/news/2023/10/31/hhs-office-civilrights-settles-ransomware-cyber-attackinvestigation.html (last visited March 29, 2024).
[42] *Cost of a Data Breach Report 2023*, IBM, *available at* https://www.ibm.com/reports/data-breach.
[43] *2019 HIMSS Cybersecurity Survey*, HIMSS, https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report.pdf (last visited March 29, 2024).
[44] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, CHIEF HEALTHCARE EXEC. (Apr. 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks.

Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[45] A behemoth like UHG stores the records of millions.

65. Shortly after UHG announced the Data Breach, the New York Times noted that there was "little question that United, whose sprawling businesses touch nearly every aspect of health care, made for a particularly rich target."[46] Fred Langston, the chief product officer for Critical Insight, a cybersecurity firm, told the New York Times "If you're going to go after stealing records, you want to go after the biggest pot of records you can get," because "[y]ou're literally hitting the jackpot."[47]

66. Defendants knew or reasonably should have known the importance of implementing reasonable and adequate practices and procedures in order to safeguard the PII and PHI entrusted to it by individuals receiving healthcare services.

67. Defendants knew, or reasonably should have known, the importance of safeguarding the Private Information entrusted to it, and of the foreseeable consequences if their data security systems were breached. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

***<u>The Data Breach was Preventable</u>***

68. Defendants' cybersecurity practices and policies were inadequate and fell short of the industry-standard measures that should have been implemented long before the Data Breach

---

[45] The HIPAA Journal, *Editorial: Why Do Criminals Target Medical Records* (October 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last visited March 29, 2024).

[46] Reed Abelson, *A Cyberattack on a UnitedHealth Unit Disrupts Prescription Drug Orders*, N.Y. Times (Feb. 27, 2024), https://www.nytimes.com/2024/02/26/health/cyberattack-prescriptions-united-healthcare.html.

[47] *Id*.

occurred. This is especially true given that the healthcare industry is frequently one of the most targeted sectors for cyberattacks. Attacks using stolen credentials have increased precipitously over the last several years.

69. Healthcare providers and their affiliates like Defendants are prime targets because of the information they collect and store, including financial information of patients, login credentials, insurance information, medical records and diagnoses, and personal information of employees and patients—all extremely valuable on underground markets.

70. This was known and obvious to Defendants as Defendants observed frequent public announcements of data breaches affecting healthcare providers and knew that information of the type they collected, maintained, and stored is highly coveted and a frequent target of hackers.

71. It is well known that use of stolen credentials has long been the most popular and effective method of gaining authorized access to a company's internal networks and that companies should activate defenses to prevent such attacks.

72. According to the Federal Bureau of Investigation (FBI), phishing schemes designed to induce individuals to reveal personal information, such as network passwords, were the most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between 2019 and 2020.[48] According to Verizon's 2021 Data Breach Investigations Report, 43% of breaches stemmed from phishing and/or pretexting schemes.[49]

---

[48] *2020 Internet Crime Report*, FBI, https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf (last visited Mar. 29, 2024).

[49] *2021 DBIR Master's Guide*, VERIZON, https://www.verizon.com/business/resources/reports/dbir/2021/masters-guide/ (subscription required) (last visited Mar. 29, 2024).

73. The risk is so prevalent for healthcare providers that on October 28, 2020, the FBI and two federal agencies issued a "Joint Cybersecurity Advisory" warning that they have "credible information of an increased and imminent cybercrime threat to U.S. hospitals and healthcare providers."[50] The Cybersecurity and Infrastructure Security Agency (CISA), the Department of Health and Human Services (HHS), and the FBI issued the advisory to warn healthcare providers to take "timely and reasonable precautions to protect their networks from these threats."[51]

74. More recently, the FBI and CISA issued a Joint Cybersecurity Advisory on December 19, 2023, which updated the April 19, 2022 FBI FLASH *BlackCat/ALPHV Ransomware Indicators of Compromise*. The FBI and CISA encouraged critical infrastructure organizations such as UHG to implement various recommendations set forth in the advisory to reduce the likelihood and impact of inevitable ALPHV Blackcat ransomware and data extortion efforts. They provided step-by-step technical details associated with the ALPHV Blackcat organization and its attack techniques, and advised critical infrastructure organizations of "actions to take today," including to "prioritize remediation of known exploited vulnerabilities."[52]

75. There are two primary ways to mitigate the risk of stolen credentials: user education and technical security barriers.

---

[50] *Ransomware Activity Targeting the Healthcare and Public Health Sector*, JOINT CYBERSECURITY ADVISORY, https://www.cisa.gov/sites/default/files/publications/AA20-302A_Ransomware%20_Activity_Targeting_the_Healthcare_and_Public_Health_Sector.pdf (last visited Mar. 28, 2024).
[51] *Id*.
[52] *#StopRansomware: ALPHV Blackcat*, JOINT CYBERSECURITY ADVISORY, https://www.cisa.gov/sites/default/files/2024-03/aa23-353a-stopransomware-alphv-blackcat-update_2.pdf (last visited Mar. 29, 2024).

76. User education is the process of making employees or other users of a network aware of common disclosure schemes and implementing company-wide policies requiring the request or transfer of sensitive personal or financial information only through secure sources to known recipients.

77. Companies can also greatly reduce the flow of fraudulent e-mails by installing technical security barriers including software that scans all incoming messages for harmful attachments or malicious content and implementing certain security measures governing e-mail transmissions, including Sender Policy Framework (SPF) (e-mail authentication method used to prevent spammers from sending messages on behalf of a company's domain), DomainKeys Identified Mail (DKIM) (e-mail authentication method used to ensure messages are not altered in transit between the sending and recipient servers), and Domain-based Message Authentication, Reporting and Conformance (DMARC), which "builds on the widely deployed [SPF] and [DKIM] protocols, adding a reporting function that allows senders and receivers to improve and monitor protection of the domain from fraudulent email."[53]

78. In addition to mitigating the risk of stolen credentials, the CISA guidance encourages organizations to prevent unauthorized access by:

- Conducting regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;
- Regularly patching and updating software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;
- Ensuring devices are properly configured and that security features are enabled;

[53] *#StopRansomware Guide*, https://www.cisa.gov/stopransomware/ransomware-guide (last visited March 28, 2024).

- Employing best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and
- Disabling operating system network file sharing protocol known as Server Message Block (SMB) which is used by threat actors to travel through a network to spread malware or access sensitive data.[54]

79. The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.[55]

80. Despite holding the Private Information of millions of patients, Defendants failed to adhere these recommended best practices. Indeed, had Defendants implemented common sense security measures like network segmentation and POLP, the hackers never could have accessed millions of patient files and the breach would have been prevented or much smaller in scope. Defendants also lacked the necessary safeguards to detect and prevent phishing attacks and failed to implement adequate monitoring or control systems to detect the unauthorized infiltration after it occurred.

81. Defendants, like any entity in the healthcare industry their size storing valuable data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to millions of patient files. Defendants'

[54] *Id.*
[55] *Id.*

procedures and policies were below industry-standards and are inexcusable given Defendants' knowledge that they were a prime target for cyberattacks.

***<u>Allegations Relating to Plaintiff Heidi Humphreys</u>***

82. Plaintiff Heidi Humphreys is a resident and citizen of Pennsylvania and uses a local pharmacy that uses UHG's Change Healthcare platform to fill her medical prescriptions.

83. For purposes of receiving medical treatment, Ms. Humphreys was required to provide her healthcare provider with her sensitive personal information, including, among other information, her full name, contact information, date of birth, Social Security number, and health insurance information.

84. Ms. Humphreys' healthcare provider also maintained Ms. Humphreys' patient account numbers, health insurance information, medical record numbers, dates of service, provider names, and medical and clinical treatment information.

85. Ms. Humphreys' healthcare provider shared Ms. Humphreys' Private Information, including her PHI with her pharmacy who then shared it with Defendants in connection with filling Ms. Humphreys' prescription. Defendants stored Ms. Humphreys' Private Information in their systems.

86. Ms. Humphreys learned of the Data Breach after having challenges filling her prescription. Ms. Humphreys requires prescription medication for a chronic health condition. Ms. Humphreys uses her health insurance and discount coupons when available to pay for her medications. Sometime after February 21, 2024, Ms. Humphreys went to fill her prescription at her local pharmacy but was unsuccessful. Ms. Humphreys was told by the pharmacy that their system was down and had been down for weeks, so they could not process her insurance or the discount coupon she presented; and could not provide her medication to her. The prescription

Ms. Humphreys was unable to timely fill is for an ongoing health condition and need to be taken regularly. As a result of the Data Breach, Ms. Humphreys was unable to fill her prescription prior to her medication running out. As a result of the Data Breach, Ms. Humphreys was forced to go without her medications for a period of time, which exacerbated her ongoing health condition. As a result of the Data Breach, Ms. Humphreys could not timely fill her prescription for her medication subjecting Ms. Humphreys to potential negative health risks.

87. As a result of the Data Breach, Ms. Humphreys has suffered lost time, annoyance, interference, and inconvenience addressing and monitoring for adverse personal impacts caused by the Data Breach. This is time Ms. Humphreys otherwise would have spent performing other activities.

88. In addition, Ms. Humphreys has suffered and will continue to suffer emotional distress as a result of the Data Breach, and has increased concerns for the loss of her privacy and the release of her Private Information, which she would not have suffered had Defendants implemented the necessary and proper safeguards to protect Plaintiff's and Class Members' Private Information from theft.

89. The Private Information that was accessed in the Data Breach was the kind of sensitive information that can be used to commit fraud and identity theft. It was reasonable and foreseeable that Ms. Humphreys would take, and continue to take, necessary measures to protect her Private Information.

90. On April 22, 2024, more than two months after UHG first disclosed that Defendants were the subject of a massive data breach, UHG for the first time confirmed that that "Based on initial targeted data sampling to date, the company has found files containing protected health information (PHI) or personally identifiable information (PII), which could

cover a substantial proportion of people in America," included in the data compromised in the Data Breach.

91. As of the date this complaint was filed, Defendants have not yet provided notice directly to any persons whose data was compromised and likely will not do so for several months, leaving "a substantial portion of people in America" in limbo regarding whether and which of their PHI was compromised in the Data Breach.

92. Instead, Defendants continue to make excuses for the continued delays: "Given the ongoing nature and complexity of the data review, it is likely to take several months of continued analysis before enough information will be available to identify and notify impacted customers and individuals."

93. Although Defendants have unreasonably failed to provide information concerning their knowledge and understanding of the nature and scope of the Data Breach, Plaintiff reasonably believes based on pubic reports – and the severity and length of the disruption the Data Breach has and continues to cause the United States healthcare system – that Defendants did not maintain and continue to not maintain her Private Information with adequate protections and safeguards and that her Private Information was part of the massive amount of Private Information exposed during the Data Breach.

94. Ms. Humphreys has a continuing interest in ensuring that her Private Information, which, upon information and belief, remain in Defendants' possession, is protected and safeguarded from further and future breaches.

95. Ms. Humphreys suffered actual injury in the form of damages to and loss of value of her Private Information—a form of intangible property that Ms. Humphreys entrusted to

Defendants for the purpose of receiving healthcare services, which was compromised in, and as a result, of the Data Breach.

96. As a result of the Data Breach, Ms. Humphreys will continue to be at heightened risk for financial fraud, medical fraud and identity theft, and the attendant damages, for years to come.

***<u>The Value of Private Information and the Effects of Unauthorized Disclosure</u>***

97. At all relevant times, Defendants were well aware that the Private Information they collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

98. The value of Private Information is axiomatic considering the value of "big data" in corporate America.

99. Private Information is also a valuable commodity to cyber attackers. The U.S. Attorney General confirmed in 2020 that "hackers" target consumers' sensitive personal information because it "has economic value."[56]

100. As the Federal Trade Commission ("FTC") recognizes, identity thieves can use Private Information to commit an array of crimes including identify theft, and medical and financial fraud.[57] Indeed, a robust "cyber black market" exists in which criminals openly post stolen Private Information on multiple underground websites, commonly referred to as the dark web.

---

[56] *Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice (February 10, 2020), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-announces-indictment-fourmembers-china-s-military (last visited March 29, 2024).

[57] *What to Know About Identify Theft*, Fed. Trade Comm'n, https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited March 29, 2024).

101. While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363.[58]

102. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

103. Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "'Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery,'" reported Pam Dixon, executive director of World Privacy Forum. "'Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities.'"[59]

104. Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.[60]

[58] *Data Breaches: In the Healthcare Sector*, Ctr. for Internet Sec., https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited March 29, 2024).
[59] Michael Ollove, *The Rise of Medical Identity Theft in Healthcare*, Kaiser Health News (Feb. 7, 2014), https://khn.org/news/rise-of-indentity-theft/.
[60] *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI CYBER DIV. (Apr. 8, 2014), https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf.

105. The ramifications of Defendants' failures to keep Plaintiff' and Class Members' Private Information secure are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

106. Further, criminals often trade stolen Private Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Private Information on the internet, thereby making such information publicly available.

107. Approximately 21% of victims do not realize their identity has been compromised until more than two years after it has happened.[61] This gives thieves ample time to seek multiple treatments under the victim's name. And 40% of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[62]

108. As a company contracting with public health sector government entities, Defendants knew, or reasonably should have known, the importance of safeguarding Plaintiff' and Class Members' Private Information entrusted to it, and of the foreseeable consequences if their data security systems were breached. This includes the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

[61] *See Medical ID Theft Checklist*, IdentityForce https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last visited March 29, 2024).

[62] *The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages*"), Experian (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.

***Defendants Failed to Comply with Federal Law and Regulatory Guidance***

109. HIPAA requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components. [63]

110. Each Defendant is a covered entity under HIPAA and is therefore required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

111. These rules establish national standards for the protection of patient information, including PHI, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. 45 C.F.R. § 160.103.

112. HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."[64]

113. HIPAA requires that Defendants implement appropriate safeguards for this information.[65]

114. Title II of HIPAA contains the Administrative Simplification provisions. 42 U.S.C. §§1301, *et seq*. These provisions require, among other things, that the Department of

[63] *What is Considered Protected Health Information Under HIPAA?*, HIPAA J. (Jan. 1, 2023), https://www.hipaajournal.com/what-is-considered-protected-health-information-under-hipaa/.
[64] 45 C.F.R. § 164.502.
[65] 45 C.F.R. § 164.530(c)(1).

Health and Human Services ("HHS") create rules to streamline the standards for handling Private Information like the data Defendants failed to safeguard. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

115. HIPAA requires that Defendants provide notice of a breach of unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons—i.e. non-encrypted data.[66]

116. The HIPAA Breach Notification Rule, 45 CFR §§164.400-414, also required Defendants to provide notice of the breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of a breach."[67]

117. Based on information and belief, UHG's Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations and industry standards. Defendants' security failures include, but are not limited to:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

b. Failing to adequately protect the PHI of patients;

c. Failing to ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

[66] 45 C.F.R. § 164.404; 45 C.F.R. § 164.402.

[67] *Breach Notification Rule*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited March 29, 2024) (emphasis added).

d. Failing to implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e. Failing to implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. Failing to implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g. Failing to protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

h. Failing to ensure compliance with the electronically protected health information security standard rules by their workforces, in violation of 45 C.F.R. § 164.306(a)(4);

i. Failing to train all members of their workforces effectively on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of protected health information, in violation of 45 C.F.R. § 164.530(b);

j. Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

k. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2); and/or

l. Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3).

***Defendants Failed to Comply with FTC Guidelines***

118. The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.[68]

119. Defendants were prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTCA.[69]

---

[68] *Start with Security*, FTC, https://www.ftc.gov/system/files/documents/plain- language/pdf0205-startwithsecurity.pdf (last visited Mar. 29, 2024).
[69] *See, e.g.*, *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 407 (E.D. Va. 2020) (citing *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)).

120. According to the FTC, the need for data security should be factored into all business decision-making.[70]

121. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[71] The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

122. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[72] This is consistent with guidance provided by the FBI, HHS, and the principles set forth in the CISA 2020 guidance.

123. The FTC also states that outdated software undermines security, and recommends that software be updated regularly, third party patches be implemented as they are issued, and

---

[70] *Start With Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited March 29, 2024).

[71] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited March 29, 2024).

[72] *Start With Security: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited March 29, 2024).

automated tools should be used to track which version of software is running and whether updates are available.[73]

124. The FTC strongly encourages businesses to "[p]ut procedures in place to keep your security current and address vulnerabilities that may arise," including to "[c]heck expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities, and implement policies for installing vendor-approved patches to correct problems." The FTC also cautions businesses to heed credible security warnings and move quickly to fix them. Businesses are strongly encouraged to "[h]ave an effective process in place to receive and address security vulnerability reports." [74]

125. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations. [75]

126. Defendants failed to properly implement basic data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. §45.

---

[73] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited March 29, 2024).
[74] *Id*.
[75] *Privacy and Security Enforcement*, FTC, https://www.ftc.gov/news-events/media- resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Mar. 29, 2024).

127. Defendants were fully aware of their obligations to protect the Private Information of Plaintiff and Class Members because of their position as service providers whose business centers on the collection, storage, and safeguarding of PII and PHI. Defendants were also aware of the significant repercussions that would result from Defendants' failure to make good on those obligations.

128. Defendants were fully aware of their obligation to implement and use reasonable measures to protect the PHI of the patients but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring.

129. Defendants' failure to employ reasonable measures to protect against unauthorized access to patient information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

***Cybercriminals Have and Will Continue to Use Plaintiff's and Class Members' PII and PHI for Nefarious Purposes***

130. Plaintiff' and Class Members' highly sensitive PII and PHI is of great value to cybercriminals, and the data stolen in the Data Breach can be used in a variety of ways for criminals to exploit Plaintiff and the Class Members and to profit off their misfortune and stolen information. The cybercriminals' motives for the Data Breach were purely nefarious and malicious in nature: their one goal was to access systems, including Defendants' systems, in order to obtain valuable PII and PHI to sell on the dark web.

131. Every year, identity theft causes tens of billions of dollars of losses to victims in the United States.[76] For example, with the PII stolen in the Data Breach, including Social

---

[76] *Facts + Statistics: Identity Theft and Cybercrime*, INS. INFO. INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (last visited March 29, 2024) (discussing Javelin Strategy & Research's report *2018 Identity Fraud: Fraud Enters a New Era of Complexity*).

Security numbers, identity thieves can open financial accounts, apply for credit, file fraudulent tax returns, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal government benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[77] These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members.

132. PII is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.

133. These risks are both certainly impending and substantial. As the FTC has reported, if cyber attackers get access to PII, they will use it.[78]

134. Cyber attackers may not use the information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

135. [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[79]

---

[77] *See*, *e.g.*, Christine DiGangi, *5 Ways an Identity Thief Can Use Your Social Security Number*, CREDIT.COM (Nov. 2, 2017), https://blog.credit.com/2017/11/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[78] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

[79] Stolen Laptops Lead to Important HIPAA Settlements, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Apr. 22, 2014), https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

136. If cyber criminals manage to access PII, health insurance information, and other personally sensitive data, as is the case with this Data Breach, there is no limit to the amount of fraud to which Defendants may have exposed Plaintiff and Class Members.

***Defendants Owed a Duty to Plaintiff and Class Members to Keep Their Private Information Secure and Protect It From Being Compromised, Lost, Stolen, Accessed, or Misused***

137. In addition to their obligations under state laws and regulations, Defendants owed a common law duty to Plaintiff and Class Members to protect Private Information entrusted to it, including to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties. This duty extends to Defendants' obligations to safeguard PII and PHI shared with subcontractors and service vendors who received Private Information from Defendants, and to conduct ongoing, robust due diligence into such subcontractors and service vendors prior to contracting and throughout any relationship.

138. Defendants further owed and breached their duties to Plaintiff and Class Members to implement processes and specifications that would detect a breach of Defendants' security systems in a timely manner and to timely act upon warnings and alerts, including those generated by Defendants' own security systems. Instead of implementing such processes and specifications, Defendants allowed the Data Breach to go undetected for three days before recognizing unusual activity.

139. As a direct result of Defendants' intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, cyber attackers were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiff' and Class Members'

Private Information as detailed above, and Plaintiff are now at a heightened risk of identity theft and fraud.

140. The Data Breach was a direct and proximate result of Defendants' failure to: (a) properly safeguard and protect Plaintiff' and Class Members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and common law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff' and Class Members' Private Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

141. Defendants had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite their obligation to protect patient data.

142. Had Defendants remedied the deficiencies in Defendants' data security systems and adopted security measures recommended by experts in the field, it would have prevented the intrusions into their systems and, ultimately, the theft of Plaintiff' and Class Members' Private Information.

***<u>The Impact of the Data Breach on Victims</u>***

143. The Private Information exposed in the Data Breach is highly coveted and valuable on underground markets as it can be used to commit identity fraud, including medical-related identity theft and fraud, one of the most dangerous and costly forms of identity theft.

144. According to a *Reuters* investigation that included interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data for sale on underground markets "includes names, birth dates, policy numbers, diagnosis codes and billing information" which fraudsters commonly use "to create fake IDs to buy medical equipment or

drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers."[80]

145. According to Tom Kellermann, chief cybersecurity officer of cybersecurity firm Carbon Black, "Health information is a treasure trove for criminals [because] by compromising it, by stealing it, by having it sold, you have seven to 10 personal identifying characteristics of an individual."[81] For this reason, a patient's full medical records can sell for up to $1,000 on the dark web, while credit card numbers and Social Security numbers may cost $5 or less.[82]

146. As noted by Paul Nadrag, a software developer for medical device integration and data technology company Capsule Technologies: "The reason for this price discrepancy—like any other good or service—is perceived value. While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information. Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy medical records to support their criminal activities, such as illegally obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans."[83]

---

[80] Caroline Humer & Jim Finkle, *Your medical record is worth more to hackers than your credit card*, REUTERS (Sep. 24, 2014), .https://www.reuters.com/article/us-cybersecurity- hospitals/your-medical-recordis-worth-more-to-hackers-than-your-credit-card- idUSKCN0HJ21I20140924.

[81] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon

[82] . Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personalinformation-is-selling-for-on-the-dark-web/.

[83] Paul Nadrag, *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web*, FIERCE HEALTHCARE (Jan. 26, 2021, 3:55 PM),

147. Indeed, while federal law generally limits an individual's responsibility for fraudulent charges on a credit card to $50, there are no such protections for a stolen medical identity. According to a 2015 survey on medical identity theft conducted by the Ponemon Institute, victims of medical identity theft spent an average of $13,500 in out-of-pocket costs to resolve the crime.[84] Frequently, this information was used to obtain medical services or treatments (59%), obtain prescription drugs (56%), or receive Medicare and Medicaid benefits (52%). Only 14% of respondents said that the identity thieves used the information to obtain fraudulent credit accounts, indicating that medical information is a much more profitable market.[85]

148. According to the Ponemon study, "[t]hose who have resolved the crime spent, on average, more than 200 hours on such activities as working with their insurer or healthcare provider to make sure their personal medical credentials are secured and can no longer be used by an imposter and verifying their personal health information, medical invoices and claims and electronic health records are accurate."[86]

149. Additionally, the study found that medical identity theft can have a negative impact on reputation as 45% of respondents said that medical identity theft affected their reputation mainly because of embarrassment due to disclosure of sensitive personal health conditions, with 19% responding that they missed out on employment opportunities as a result.[87]

---

https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers- medicalrecords-are-hottest-items-dark-web.

[84] *Fifth Annual Study on Medical Identity Theft*, PONEMON INSTITUTE (Feb. 2015), https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 ("Ponemon Study").

[85] *Id*. at 9.

[86] *Id*. at 2.

[87] *Id*. at 14.

150. Exacerbating the problem, victims of medical identity theft oftentimes struggle to resolve the issue because HIPAA regulations require the victim to be personally involved in the resolution of the crime.[88] In some cases, victims may not even be able to access medical records using their personal information because they include a false name or data points taken from another person's records. Consequently, only 10% of medical identity theft victims responded that they "achiev[ed] a completely satisfactory conclusion of the incident."[89]

151. Moreover, it can take months or years for victims to even discover they are the victim of medical-related identity theft or fraud given the difficulties associated with accessing medical records and healthcare statements. For example, the FTC notes that victims may only discover their identity has been compromised after they:

- Receive a bill for medical services they did not receive;
- Get contacted by a debt collector about medical debt they do not owe;
- See medical collection notices on their credit report that they do not recognize;
- Find erroneous listings of office visits or treatments on their explanation of benefits (EOB);
- Receive information from their health plan that they have reached their limit on benefits; or
- Be denied insurance because their medical records show a condition they do not have.[90]

[88] *Id*. at 1.
[89] *Id*.
[90] *Medical Identity Theft, FAQs for Health Care Providers and Health Plans*, FTC.GOV, https://www.ftc.gov/system/files/documents/plain-language/bus75-medical-identity-theft- faqhealth-care-health-plan.pdf (last visited Mar. 29, 2024).

152. Perhaps most dangerous, however, is the potential for misdiagnoses or treatment. According to Ann Patterson, a senior vice president of the Medical Identity Fraud Alliance, "About 20 percent of victims have told us that they got the wrong diagnosis or treatment, or that their care was delayed because there was confusion about what was true in their records due to the identity theft." [91] This echoes the Ponemon study, which notes that "many respondents are at risk for further theft or errors in healthcare records that could jeopardize medical treatments and diagnosis."[92]

153. According to a Consumer Reports article entitled *The Rise of Medical Identity Theft*, this outcome "isn't a hypothetical problem" as the "long tail on medical identity theft can create havoc in victims' lives."[93] As one example, a pregnant woman reportedly used a victim's medical identity to pay for maternity care at a nearby hospital. When the infant was born with drugs in her system, the state threatened to take the *victim's* four children away—not realizing her identity had been stolen. The victim ultimately had to submit to a DNA test to remove her name from the infant's birth certificate, but it took years to get her medical records corrected.[94]

154. Other types of medical fraud include "leveraging details specific to a disease or terminal illness, and long-term identity theft."[95] According to Tom Kellermann, "Traditional criminals understand the power of coercion and extortion. By having healthcare information—

---

[91] Michelle Andrews, *The Rise of Medical Identity Theft*, CONSUMER REPORTS, https://www.consumerreports.org/medical-identity-theft/medical-identity-theft/ (last visited Mar. 29, 2024).
[92] Ponemon Study at 1.
[93] Michelle Andrews, *The Rise of Medical Identity Theft*, CONSUMER REPORTS, https://www.consumerreports.org/medical-identity-theft/medical-identity-theft/ (last visited Mar. 29, 2024).
[94] *Id*.
[95] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[96] Long-term identity theft occurs when fraudsters combine a victim's data points, including publicly-available information or data points exposed in other data breaches, to create new identities, open false lines of credit, or commit tax fraud that can take years to remedy.

155. Many victims of the Data Breach have likely already experienced significant harms as the result of the Data Breach, including, but not limited to, medical-related identity theft and fraud. Plaintiff and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and healthcare statements, checking credit reports, and spending time and effort searching for unauthorized activity.

156. It is no wonder then that identity theft exacts a severe emotional toll on its victims. The 2017 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed;
- 67% reported anxiety;
- 66% reported feelings of fear related to personal financial safety;
- 37% reported fearing for the financial safety of family members;
- 24% reported fear for their physical safety;
- 15.2% reported a relationship ended or was severely and negatively impacted by the identity theft; and

[96] *Id.*

- 7% reported feeling suicidal.[97]

157. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances;
- 37.1% reported an inability to concentrate / lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[98]

158. The unauthorized disclosure of the sensitive PHI and other Private Information to data thieves also deprives its owner of its value, which has been recognized by courts as an independent form of harm.[99]

159. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes.

[97] *Identity Theft: The Aftermath 2017*, ITRC, https://www.idtheftcenter.org/wpcontent/uploads/images/page-docs/Aftermath_2017.pdf (last visited March 29, 2024).
[98] *Id.*
[99] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge— the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense.

160. As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. the unconsented disclosure of confidential information to a third party;
b. losing the value of the explicit and implicit promises of data security;
c. identity theft and fraud resulting from the theft of their Private Information;
d. costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;
e. anxiety, emotional distress, and loss of privacy;
f. costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;
g. unauthorized charges and loss of use of and access to their financial and investment account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;
h. lowered credit scores resulting from credit inquiries following fraudulent activities;
i. costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for

fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

j. the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their Private Information being in the possession of one or many unauthorized third parties.

161. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement.

162. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "[r]esolving the problems caused by identity theft [could] take more than a year for some victims."[100]

163. There may also be a significant time lag between when personal information is stolen and when it is misused for fraudulent purposes. According to the Government Accountability Office, which conducted a study regarding data breaches: "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[101]

---

[100] Erika Harrell, & Lynn Langton, *Victims of Identity Theft, 2012,* U.S. DEP'T OF JUST., OFF. OF JUST. PROGRAMS BUREAU OF JUST. STATS. (Dec. 2013), https://www.bjs.gov/content/pub/pdf/vit12.pdf.

[101] PERSONAL INFORMATION: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown, GAO, http://www.gao.gov/new.items/d07737.pdf (last visited Mar. 29, 2024).

164. Plaintiff and Class Members place significant value in data security. According to a survey conducted by cyber-security company FireEye Mandiant, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security. Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[102]

165. Because of the value consumers place on data privacy and security, healthcare providers with robust data security practices are viewed more favorably by patients and can command higher prices than those who do not. Consequently, had patients known the truth about Defendants' data security practices—that it did not adequately protect and store their Private Information, including PHI —they would not have sought medical care and/or filled prescriptions practices affiliated with Defendants or would have paid significantly less. As such, Plaintiff and Class members did not receive the benefit of their bargain with Defendants because they paid for the value of services they did not receive.

166. Plaintiff and Class members have a direct interest in Defendants' promises and duties to protect their Private Information, *i.e.*, that Defendants *not increase* their risk of identity theft and fraud. Because Defendants failed to live up to their promises and duties in this respect, Plaintiff and Class members seek the present value of identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by Defendants wrongful conduct. Through this remedy, Plaintiff and Class members seek to restore themselves and class members as close to the same position as they would have occupied but

---

[102] *BEYOND THE BOTTOM LINE: THE REAL COST OF DATA BREACHES*, FIREEYE, https://www2.fireeye.com/rs/848-DID-242/images/rpt-beyond-bottomline.pdf (last visited Mar. 29, 2024).

for Defendants' wrongful conduct, namely their failure to adequately protect Plaintiff's and Class members' Private Information.

167. Plaintiff and Class members further seek to recover the value of the unauthorized access to their Private Information permitted through Defendants' wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's Private Information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.*, a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff and Class Members have a protectible property interest in their Private Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, *i.e.*, evidence regarding the value of similar transactions.

168. Because Defendants continue to hold the Private Information of patients, Plaintiff and Class members have an undeniable interest in ensuring that their Private Information is secured, remains secure, and is not subject to further theft.

## CLASS ACTION ALLEGATIONS

169. Plaintiff brings this class action on behalf of herself and all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

170. The Class that Plaintiff seeks to represent is defined as follows:

All individuals whose personal health information was compromised in the Data Breach announced by UnitedHealth Group Incorporated in February 2024.

171. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers, and directors, current or former employees, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

172. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

173. Numerosity, Fed. R. Civ. P. 23(a)(1): The members of the Class are so numerous that joinder of all of them is impracticable. Blackcat revealed that the Private Information of millions of patients associated with Defendants is compromised.

174. Commonality and Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These common questions of law and fact are such that there is a

well-defined community of interest in this litigation. The common questions of law and fact include, without limitation:

a. Whether Defendants owed Plaintiff and Class Members a duty to implement and maintain reasonable security procedures and practices to protect their Private Information;

b. Whether Defendants violated their duty to implement reasonable security systems to protect Plaintiff's and Class Members' Private Information;

c. Whether Defendants' breach of their duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiff and Class Members;

d. Whether Defendants owed a duty to Plaintiff and the Class to exercise due care in collecting, storing, safeguarding, and/or obtaining their Private Information;

e. Whether Defendants violated their duty to exercise due care in collecting, storing, safeguarding, and/or obtaining their Private Information;

f. Whether Defendants' breach of their duty to exercise due care in collecting, storing, safeguarding, and/or obtaining their Private Information directly and/or proximately caused damages to Plaintiff and Class Members;

g. Whether Defendants received a benefit without proper restitution making it unjust for Defendants to retain the benefit without commensurate compensation;

h. Whether Defendants acted negligently in connection with the monitoring and/or protection of Plaintiff's and Class Members' Private Information;

i. Whether Defendants adequately addressed and fixed the vulnerabilities that enabled the Data Breach;

j. Whether Defendants and class members are entitled to damages to pay for future protective measures like credit monitoring and monitoring for misuse of medical information; and

k. Whether class members are entitled to compensatory damages, punitive damages, and/or statutory or civil penalties as a result of the Data Breach.

175. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of the members of the Class because all class members had their Private Information compromised in the Data Breach and were harmed as a result.

176. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

177. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no known interest antagonistic to those of the Class and her interests are aligned with Class members' interests. Plaintiff was subject to the same Data Breach as class members, suffered similar harms, and face similar threats due to the Data Breach. Plaintiff has also retained competent counsel with significant experience litigating complex class actions, including data breach cases involving multiple classes and data breach claims.

178. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action

treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendants. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

179. The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since Defendants would be able to exploit and overwhelm the limited resources of the Class with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

180. The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

181. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

182. Unless a Class-wide injunction is issued, Plaintiff and Class Members remain at risk that Defendants will continue to fail to properly secure the Private Information of Plaintiff and Class Members resulting in another data breach, continue to refuse to provide proper notification to Class Members regarding the Data Breach, and continue to act unlawfully as set forth in this Class Action Complaint.

183. Defendants acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

184. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

- Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, using, and safeguarding their Private Information;
- Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;
- Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

- Whether Defendants failed to implement and maintain reasonable and adequate security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and
- Whether Class Members are entitled to actual damages, additional credit monitoring or other injunctive relief, and/or punitive damages as a result of Defendants' wrongful conduct.

185. Class Identity: The members of the Class are readily identifiable and ascertainable. Defendants and/or their affiliates, among others, possess the information to identify and contact class members.

## CLAIMS FOR RELIEF

### COUNT I
**Negligence**
***(On Behalf of Plaintiff and the Class)***

186. Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 185 as though fully set forth herein.

187. Plaintiff and Class Members were required to submit their Private Information to Defendants as a condition of receiving healthcare services and in order for Defendants to perform their processing and insurer functions in connection with patients receiving medical treatment.

188. Defendants stored Plaintiff's and Class Members' Private Information for purposes of providing health insurance services as well as for commercial gain.

189. Defendants knew, or should have known, of the risks inherent in collecting and storing the Private Information of Plaintiff and Class Members.

190. As described above, Defendants owed duties of care to Plaintiff and Class Members whose Private Information had been entrusted with Defendants.

191. The duties of care owed by Defendants include a duty to exercise reasonable care in protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure or access. Defendants acknowledged this duty in their privacy policies, where they promised not to disclose PHI and other Private Information, including SSNs, without authorization and to abide by all federal laws and regulations.

192. The duties of care owed by Defendants include also include a duty to provide adequate data security, consistent with industry standards, to ensure that Defendants' systems and networks adequately protected Plaintiff's and Class Members' Private Information.

193. Under HIPAA, Defendants had a special relationship with Plaintiff and Class Members who entrusted Defendants to adequately safeguard their confidential personal, financial, and medical information.

194. Defendants also entered into a special relationship with Plaintiff and Class Members because Defendants collected the Private Information of Plaintiff and Class Members – information that Plaintiff and Class Members were required to provide in order to receive medical services, prescriptions, and payment for healthcare services.

195. Defendants' duty to use reasonable care in protecting Plaintiff's and Class Members' Private Information arises as a result of the parties' relationship, as well as common law and federal law, including the HIPAA regulations described above and Defendants' own policies and promises regarding privacy and data security.

196. Defendants breached their duty to Plaintiff and Class Members in numerous ways, as described herein, including by:

- Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the Private Information of Plaintiff and Class Members;
- Failing to comply with industry standard data security measures for the healthcare industry leading up to the Data Breach;
- Failing to comply with their own privacy policies;
- Failing to comply with regulations protecting the Private Information at issue during the period of the Data Breach;
- Failing to adequately monitor, evaluate, and ensure the security of Defendants' network and systems; and
- Failing to recognize in a timely manner that Private Information had been compromised.

197. Defendants acted with wanton disregard for the security of Plaintiff's and Class Members' Private Information. Defendants knew or reasonably should have known that it had inadequate data security practices to safeguard such information, and Defendants knew or should have known that data thieves were attempting to access databases containing Private Information such as that entrusted to Defendants.

198. Plaintiff's and Class Members' Private Information would not have been compromised but for Defendants' wrongful and negligent breach of their duties.

199. But for Defendants' wrongful and negligent breaches of the duties owed to Plaintiff and the Class Members, Plaintiff and the Class Members would not have been injured.

200. Defendants' failure to take proper security measures to protect the sensitive PHI and other Private Information of Plaintiff and Class Members as described in this Complaint,

created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access and copying of Private Information by unauthorized third parties. Given that healthcare providers and affiliates are prime targets for hackers, Plaintiff and Class Members are part of a foreseeable, discernible group that was at high risk of having their Private Information misused or disclosed if not adequately protected by Defendants.

201. It was also foreseeable that Defendants' failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiff and Class Members.

202. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have and will suffer damages in an amount to be proven at trial, including: (i) the loss of rental or use value of their Private Information; (ii) the unconsented disclosure of their Private Information to unauthorized third parties; (iii) out-of- pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised Private Information for the rest of their lives; and (ix) any nominal damages that may be awarded.

**<u>COUNT II</u>**
**Negligence *Per Se***
***(On Behalf of Plaintiff and the Class)***

203. Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 185 as though fully set forth herein.

204. The Federal Trade Commission Act ("FTC Act") prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC.

205. Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate data security practices to safeguard Plaintiff's and Class Members' Private Information.

206. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

207. Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

208. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

209. Pursuant to HIPAA (42 U.S.C. §§ 1302d, *et seq*.), Defendants had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

210. Plaintiff and Class Members are within the class of persons that HIPAA and its implementing regulations were intended to protect.

211. The harm that occurred as a result of the Data Breach is the type of harm HIPAA was intended to guard against.

212. Defendants breached their duties to Plaintiff and Class Members under the FTC Act (15 U.S.C. § 45) and HIPAA (42 U.S.C. §§ 1302d, *et seq*.), by failing to provide fair, reasonable, or adequate data security practices to safeguard Plaintiff's and Class Members' Private Information.

213. Defendants' conduct was unreasonable given the nature and amount of Private Information they obtained, stored, and disseminated in the regular course of their business, and the foreseeable consequences of a data breach, including, specifically, the significant damage that would result to Plaintiff and Class Members.

214. Defendants' failures to comply with applicable laws and regulations constitutes negligence *per se*.

215. But for Defendants' wrongful and negligent breaches of their duties owed to Plaintiff and Class Members. Plaintiff and Class Members would not have been injured.

216. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breaches of their duties to Plaintiff and Class Members. Defendants knew or reasonably should have known that it was failing to meet their duties, and that Defendants' breaches of those duties would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

217. As a direct and proximate result of Defendants' negligence *per se,* Plaintiff and Class Members have injury and sustained actual losses and damages as alleged herein, in an amount to be proven at trial. Plaintiff and Class Members alternatively seek an award of nominal damages.

## COUNT III
**Breach of Third-Party Beneficiary Contract**
***(On Behalf of Plaintiff and the Class)***

218. Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 185 as though fully set forth herein.

219. Acting in the ordinary course of business, Defendants contracts with several healthcare providers to provide healthcare insurance to patients. Defendants obtain patients' Private Information, including PHI, received from their healthcare providers to perform Defendants' processing and insurance functions.

220. Upon information and belief, each of those respective contracts contained provisions requiring Defendants to protect the patient information that Defendants received in order to provide such insurance functions in carrying out the business of the contract.

221. Upon information and belief, these provisions requiring Defendants acting in the ordinary course of business to protect the Private Information of patients were intentionally included for the direct benefit of Plaintiff and Class Members, such that Plaintiff and Class Members are intended third party beneficiaries of these contracts, and therefore entitled to enforce them.

222. Defendants knew that a breach of these contract would harm Plaintiff and Class Members.

223. Defendants breached these contracts while acting in the ordinary course of business by failing to utilize adequate data security practices to safeguard Plaintiff's and Class Members' Private Information, and by otherwise not protecting Plaintiff's and Class Members' Private Information, as stated herein.

224. Plaintiff and Class Members were harmed by Defendants' breaches in failing to use reasonable data security measures to safely maintain and protect Plaintiff's and Class Members' Private Information.

225. As a direct and proximate result of Defendants' breaches, Plaintiff and Class Members sustained actual losses and damages described in detail herein, in an amount to be proven at trial. Plaintiff and Class Members alternatively seek an award of nominal damages.

**COUNT IV**
**Unjust Enrichment**
***(On Behalf of Plaintiff and the Class)***

226. Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 185 as though fully set forth herein.

227. This Count is pleaded in the alternative to the breach of third-party beneficiary claim above (Count III).

228. Plaintiff and Class Members have an interest, both equitable and legal, in their Private Information that was conferred upon, collected by, and maintained by the Defendants and which was stolen in the Data Breach. This information has independent value.

229. Plaintiff and Class Members conferred a monetary benefit on Defendants in the form of payments for medical and healthcare services, including those paid indirectly by Plaintiff and Class Members to Defendants.

230. Defendants appreciated and had knowledge of the benefits conferred upon it by Plaintiff and Class Members.

231. The price for medical and healthcare services that Plaintiff and Class Members paid (directly or indirectly) to Defendants should have been used by Defendants, in part, to pay for the administrative costs of reasonable data privacy and security practices and procedures.

232. Likewise, in exchange for receiving Plaintiff's and Class Members' valuable Private Information, which Defendants were able to use for their own business purposes and which provided actual value to Defendants, Defendants were obligated to devote sufficient resources to reasonable data privacy and security practices and procedures.

233. As a result of Defendants' conduct, Plaintiff and Class Members suffered actual damages as described herein.

234. Under principals of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and Class Members because Defendants failed to implement – or adequately implement – the data privacy and security practices that Plaintiff and Class Members paid for and that were otherwise mandated by HIPAA regulations, federal, state, and local laws, and industry standards.

235. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds they received from Plaintiff and Class Members, including damages equaling the difference in value between medical and healthcare services that included implementation of reasonable data privacy and security practices that Plaintiff and Class Members paid for and the services without reasonable data privacy and security practices that they actually received.

236. A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Plaintiff and Class Members.

## COUNT V
**Declaratory Judgment**
***(On Behalf of Plaintiff and the Class)***

237. Plaintiff repeats and realleges every allegation set forth in Paragraphs 1 through 185 as though fully set forth herein.

238. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

239. An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Private Information and whether Defendants are currently maintaining data security measures adequate to protect Plaintiff and Class Members from further cyberattacks and data breaches that could compromise their Private Information.

240. Defendants still possesses Private Information pertaining to Plaintiff and Class Members, which means their Private Information remains at risk of further breaches because Defendants' data security measures remain inadequate. Plaintiff and Class Members continue to suffer injuries as a result of the compromise of their Private Information and remain at an imminent risk that additional compromises of their Private Information will occur in the future.

241. Pursuant to the Declaratory Judgment Act, Plaintiff seeks a declaration that: (a) Defendants' existing data security measures do not comply with their obligations and duties of care; and (b) in order to comply with their obligations and duties of care, (1) Defendants must have policies and procedures in place to ensure the parties with whom Defendants share sensitive personal information maintain reasonable, industry-standard security measures, including, but not limited to, those listed at (ii), (a)-(i), *infra*, and must comply with those policies and procedures; (2) Defendants must: (i) purge, delete, or destroy in a reasonably secure manner Plaintiff's and Class Members' Private Information if it is no longer necessary to perform

essential business functions so that it is not subject to further theft; and (ii) implement and maintain reasonable, industry-standard security measures, including, but not limited to:

a. Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training their security personnel regarding any new or modified procedures;

d. Encrypting Private Information and segmenting Private Information by, among other things, creating firewalls and access controls so that if one area of Defendants' systems is compromised, hackers cannot gain access to other portions of their systems;

e. Purging, deleting, and destroying in a reasonable and secure manner Private Information not necessary to perform essential business functions;

f. Conducting regular database scanning and security checks;

g. Conducting regular employee education regarding best security practices;

h. Implementing multi-factor authentication and POLP to combat system-wide cyberattacks; and

i. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class set forth herein, respectfully requests the following relief:

A. That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is the proper class representative; and appoint Plaintiff's counsel as Class Counsel;

B. That the Court grant permanent injunctive relief to prohibit and prevent Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C. That the Court award Plaintiff and Class Members compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined at trial;

D. That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

E. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

F. That Plaintiff be granted the declaratory and injunctive relief sought herein;

G. That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

H. That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial in the instant action.

Dated: May 16, 2024

Respectfully submitted,

*/s/ Mark P. Chalos*
Mark P. Chalos
Kenneth S. Byrd
**LIEFF CABRASER HEIMANN & BERNSTEIN**
222 2nd Avenue South, Suite #1640
Nashville, TN 37201
Tel.: (615) 313-9000
mchalos@lchb.com
kbyrd@lchb.com

*/s/ Nada Djordjevic*
**DICELLO LEVITT LLP**
Adam J. Levitt (*pro hac vice* forthcoming)
Amy E. Keller (*pro hac vice* forthcoming)
Nada Djordjevic (*pro hac vice* forthcoming)
Ten North Dearborn St., Sixth Floor
Chicago, Illinois 60602
Tel.: (312) 214-7900
alevitt@dicellolevitt.com
akeller@dicellolevitt.com
ndjordjevic@dicellolevitt.com

*Counsel for Plaintiff and the Proposed Class*